1

2

3

4

5

6

7
UNITED STATES DISTRICT COURT
8
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE
9

10
FRIENDS OF THE EAST FORK,　　　　CASE NO. C05-0189JLR
INC., et al,
11
　　　　　　　　　　　　　　　　　　ORDER ON CROSS-MOTIONS
　　　　　　Plaintiffs,　　　　　　FOR SUMMARY JUDGMENT
12
　　　　　　　　　　　　　　　　　　AND MOTION TO
　　　　　v.　　　　　　　　　　　SUPPLEMENT RECORD
13

14
BARRY THOM, et al.,

15
　　　　　　Defendants,

16
　　　　　and

17
J.L. STOREDAHL & SONS, INC.,

18
　　　　　　Defendant-Intervenor.

19

20

21

22

# I.   INTRODUCTION

In these motions, the court is called upon to review decisions by the National Marine Fisheries Service and the United States Fish and Wildlife Service ("the Services") granting J.L. Storedahl & Sons, Inc. ("Storedahl") the right to take endangered and potentially endangered species from the East Fork Lewis River ("East Fork") as part of its expanded gravel mining activities.  Storedahl has been mining and processing gravel in the area for over 20 years.  After completing its earlier mining activities, Storedahl failed to comply with state requirements for reclaiming the affected mining areas.  Storedahl now promises to meet its preexisting reclamation obligations as part of the commitments it makes to the Services in order to be granted the right to expand its mining operations and potentially take endangered species from the East Fork.  The question before this court is whether the Services were required to consider Storedahl's state reclamation obligations as part of their environmental baseline analysis or whether the state obligations were too hypothetical to be included in the baseline.  As discussed below, the court is persuaded that Storedahl's preexisting obligations to reclaim land affected by its prior gravel mining is a factor that should have been considered by the Services before issuing take rights to Storedahl.  The Services' failure to consider an important aspect of the problem before it is a violation of the Administrative Procedure Act.  The court therefore remands the matter to the Services to determine the proper environmental baseline applicable to the determination of whether to issue Incidental Take Permits to Storedahl.

1    Currently before the court are Plaintiffs Friends of the East Fork, Inc. and Fish

2    First's ("East Fork Friends") motion for summary judgment (Dkt. # 51); the Federal

3    Defendants'[1] cross-motion for summary judgment (Dkt. # 57); Defendant-Intervenor

4    Storedahl's motion for summary judgment (Dkt. # 58); and Storedahl's motion to

5    supplement the administrative record or, in the alternative, motion for judicial notice

6    (Dkt. # 67).  Having reviewed the motions, the papers filed in support and opposition, the

7    administrative record, and having heard the argument of counsel for all parties, the court:

8    GRANTS East Fork Friends' motion for summary judgment (Dkt. # 51); DENIES the

9    Federal Defendants' cross-motion for summary judgment (Dkt. # 57); DENIES

10   Storedahl's motion for summary judgment (Dkt. # 58); and DENIES as MOOT

11   Storedahl's motion to supplement the administrative record (Dkt. # 67).  The court finds

12   that the Services acted arbitrarily and capriciously in failing to consider Storedahl's

13   preexisting reclamation obligations as part of their environmental baseline analysis.

14   Accordingly, the court sets aside the Services' biological opinions for failing to apply the

15   proper environmental baseline and therefore not acting in accordance with law.

16

17

18

19   _____

20   [1] The Federal Defendants are: National Oceanic and Atmospheric Administration
     National Marine Fisheries Service Northwest Region; its Acting Regional Administrator, Barry
21   Thom, United States Fish and Wildlife Service, Pacific Region; and its Regional Director, Robyn
     Thorson.  Mr. Thom and Ms. Thorson were substituted as parties pursuant to Rule 25(d)(1) of
22   the Federal Rules of Civil Procedure.

## A. Factual Background

Plaintiffs Friends of the East Fork and Fish First[2] brought this action in January 2005, seeking to reverse the grant of two incidental take permits ("ITPs")[3] issued to Storedahl.  (Compl. (Dkt. # 1) ¶ 1.)  The ITPs allow Storedahl to conduct gravel mining next to the East Fork despite its impact on endangered species of fish and wildlife.  The East Fork runs through Storedahl's Daybreak Mine site – the area where it proposes to conduct additional gravel mining activities.  The Daybreak Mine site is located on the north bank of the East Fork approximately 3.5 miles from La Center, Washington and approximately 4.5 miles northwest of Battle Ground, Washington.  (*Id.* at ¶ 10.)

East Fork Friends alleges that the ITPs were issued in violation of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1599, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-706.  (*Id.*)  It filed suit against the agencies responsible for investigating, approving, and issuing Storedahl's two ITPs: the National Marine Fisheries Service

---

[2] Friends of the East Fork was incorporated in 1993 as a nonprofit organization in Clark County dedicated to the conservation of the East Fork.  (Compl. ¶ 3.)  "Its primary goals are to help restore the East Fork's steelhead and salmon runs to near historic levels and to help restore the quality of recreational experiences on the East Fork."  (*Id.*)  Fish First is also a nonprofit organization in Clark County created in 1995.  (*Id.*)  Fish First has a similar goal as Friends of the East Fork to restore and enhance fish habitat and healthy fish runs in the Lewis River, including the East Fork.  (*Id.*)

[3] An ITP allows landowners, faced with having otherwise lawful activities prohibited by the Endangered Species Act ("ESA"), to "take" an endangered species if "such taking is incidental to, and not the purpose of the carrying out of an otherwise lawful activity."  16 U.S.C. § 1539(a)(1)(B) ("ESA Section 10(a)(1)(B)").  Congress intended the Section 10 permits or ITPs to encourage a "unique partnership" between public and private sectors, and serve the dual purposes of conserving species while providing desirable "long term assurances" to participating landowners.  *Reprinted in* 1982 U.S.C.C.A.N. 2830-31 (1982 WL 25084) (Leg. Hist.).

("NMFS"), which is part of the National Oceanic and Atmospheric Administration ("NOAA"), and the United States Fish and Wildlife Service ("FWS") (also referred to as "the Services"). (Compl. ¶ 5.) East Fork Friends originally brought six claims against the Services but only argued three of the claims in its motion for summary judgment all of which relate to its broad contentions that the Services' biological opinions unlawfully fail to meet the requirements of ESA and that the Final Environmental Impact Statement ("EIS") fails to meet basic NEPA requirements. (East Fork Friends' Mot. (Dkt. # 51) at 9.) According to East Fork Friends, the Services' failures are evidenced by their (1) treating the unreclaimed conditions at the Daybreak Mine as the "baseline" condition of the environment; (2) failing to consider an adequate range of alternatives before issuing the permits; and (3) inadequately analyzing the cumulative effects the gravel mining would have on the environment. (*See generally* East Fork Friends' Mot.)

Storedahl began mining and processing gravel at the Daybreak Mine in 1987, intermittently mining gravel there until approximately 1995. (Compl. ¶ 11.) Storedahl ceased its mining operations in 1995 but continued to process gravel on the site until 2001. (*Id.* at ¶ 11.) Upon completion of its mining activities, Storedahl performed some reclamation of the disrupted mine site but did not complete reclamation consistent with state law within the time allotted by state statute. In Washington, surface mining reclamation is governed by the state Surface Mining Act ("SMA"), Chapter 78.44 RCW. All surface mining in Washington requires a reclamation permit and plan. RCW 78.44.081, 0.91. Among other duties, the state Department of Natural Resources ("DNR") is charged with the administration and enforcement of the SMA. Thus, the

1  DNR is responsible for issuing, suspending and revoking surface mining permits and

2  enforcing the terms of the reclamation plan.  RCW 78.44.040, .050, .151, .190, .210.

3  Revised Code of Washington 78.44.111 requires that a "permit holder shall reclaim each

4  segment of the mine within two years of completion of surface mining on that segment."

5  There is no dispute that Storedahl did not complete reclamation of the property within

6  two years of closing its operations.  (*See, e.g.,* December 9, 2009 Transcript at 32.)

7          Beginning in 1997, Storedahl and the Services began working together to develop

8  a Habitat Conservation Plan ("HCP") for Storedahl's land that would allow Storedahl to

9  resume mining on a portion of the property farther from the East Fork than its original

10  gravel mine.  Storedahl's resumption of gravel mining on an additional one hundred plus

11  acres of land next to the East Fork may have an incidental effect on a number of

12  protected species that live in the East Fork and therefore its work required that it provide

13  an HCP to the Services.  Storedahl's HCP covered four affected species that are

14  considered "threatened" under the ESA – bull trout; Lower Columbia River steelhead

15  trout; Columbia River chum salmon; and Lower Columbia River chinook salmon – and

16  five affected species that are identified as "candidate species" or "species of concern"

17  under the ESA – Oregon spotted frog; Lower Columbia River/Southwest Washington

18  coho salmon; coast cutthroat trout; Pacific lamprey; and river lamprey.  The two ITPs

19  issued to Storedahl would authorize incidental takes of these nine effected species.

20  (Admin. Rec. (Dkt. # 19) at AR01494.)  The applications for the ITPs were supported by

21  Storedahls' HCP.  (*Id.*)  The Services decision to approve an HCP is governed by section

22  7 of ESA, and thus requires them to produce a biological opinion before issuing an ITP.

1    16 U.S.C. § 1536(a)(2).  Because approving the HCP and issuing the ITPs have the

2    potential to affect the environment, the agencies' actions are subject to review under

3    NEPA, which requires the Services to prepare NEPA review documents, *i.e.*, the

4    Environmental Impact Statement or EIS.[4]

5         The expected time frame for Storedahl's expanded mining project is between 10-

6    15 years but reclamation work is to be ongoing throughout the life of the project.

7    (Admin. Rec. at AR01550.)  The EIS contemplates that Storedahl will complete

8    reclamation work within six months of completing mining activity for each phase.  (*Id.* at

9    AR01558.)  The purpose of creating the HCP is to implement "conservation measures

10   designed to protect and enhance habitat of the species identified and to implement

11   Storedahl's proposed mining expansion and habitat enhancement activities within the

12   HCP area.  In short, the HCP would provide a formal mechanism for extensive ecological

13   habitat enhancement and the conservation of listed species or species of concern."  (*Id.* at

14   AR00072.)  Storedahl therefore committed to performing the conservation measures

15   outlined in the HCP in exchange for permission to conduct surface mining of sand and

16   aggregate at the Daybreak Mine within a proposed 178-acre area of the 300-acre site.

17   (*Id.* at AR01547.)  The area subject to mining and thus requiring reclamation would

18   consist of approximately 101 acres of the affected 178-acre area discussed in the EIS.

19   (*Id.*)

20

21   _____

22        [4] Pursuant to NEPA, federal agencies must prepare an environmental impact statement
     for "major Federal action [ ] significantly affecting the environment." 42 U.S.C. § 4332(2)(c).

## B.     Procedural Background

This case was stayed pending Storedahl's Washington Land Use Petition Act ("LUPA") appeal from the Clark County Board of County Commissioners' decisions reversing the hearing examiner's grant of a rezoning permit to Storedahl, which allows it to conduct additional mining on the property.  (*See* September 19, 2005 Order (Dkt. # 36) at 2.)  On September 20, 2005, the court removed this case from its active caseload but required the parties to file a joint status report every 6 months.  (September 20, 2005 Order Removing Case from Active Caseload (Dkt. # 37).)  The final status report alerted the court to the Washington Court of Appeals decision denying all LUPA appeals and affirming the Clark County hearing examiner's land use decision granting Storedahl a permit to conduct additional mining on the property.  (*See generally Storedahl v. Clark County*, 180 P.3d 848 (Wash. Ct. App. 2008); Fourth Joint Status Report, September 27, 2007 (Dkt. # 42).)  The parties requested that this court reopen East Fork Friends' administrative appeal.

## II.     ANALYSIS

## A.     Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Summary judgment is particularly applicable to cases involving judicial review of final agency action.  *See Occidental Eng' Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985).  East Fork Friends attacks as arbitrary and capricious both the Services' biological opinions and the

issuance of the Final Environmental Impact Statement.  Challenges to biological opinions

issued pursuant to ESA Section 7, 16 U.S.C. § 1536, are reviewed under the APA to

determine whether the opinion was "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Bennett v. Spear*, 520

U.S. 154, 174 (1997); *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,

143 F.3d 515, 522 (9th Cir. 1998).  The court also reviews an agency's EIS pursuant to

NEPA under the APA.  42 U.S.C. § 4332(2)(c).

In determining whether an agency decision was arbitrary or capricious, the

reviewing court "must consider whether the decision was based on a consideration of the

relevant factors and whether there has been a clear error of judgment."  *Marsh v. Oregon

Nat'l Res. Council*, 490 U.S. 360, 378 (1989).  "Normally, an agency rule would be

arbitrary and capricious if the agency has relied on factors which Congress has not

intended it to consider, entirely failed to consider an important aspect of the problem,

offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.

Co.*, 463 U.S. 29, 43 (1983).  An agency action is also arbitrary when it fails "to articulate

a satisfactory explanation for its action."  *Northern Spotted Owl v. Hodel*, 716 F. Supp.

479, 482 (W.D. Wash. 1988).

In applying the arbitrary and capricious standard, the focal point for judicial

review should be the administrative record already in existence.  *Camp v. Pitts*, 411 U.S.

138, 142 (1973); *Inland Empire Pub. Lands Council v. Glickman*, 88 F.3d 697, 703 (9th

Cir. 1996). "Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving engineering and scientific matters." *United States v. Alpine Land and Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989); *see also Northern Spotted Owl*, 716 F. Supp. at 482 ("Judicial deference to agency expertise is proper, but the Court will not do so blindly.").

**B.    Environmental Baseline**

East Fork Friends argues that the biological opinions violate ESA because they ignore Storedahl's preexisting obligation under state law to reclaim the five existing mining pits on the Daybreak Mine site. (East Fork Friends Reply (Dkt. # 60) at 1.) That is, the Services improperly offset the adverse effects of digging new pits with the benefits that Storedahl promises to provide by reclaiming the existing pits – restoration that should have been completed more than 10 years ago.[5] (*Id.* at 2.) East Fork Friends relies on RCW § 78.44.111's provision that the mining permit holder *shall* reclaim "each segment of the mine within two years of completion of surface mining on that segment" for support of its argument that the Services should have included Storedahl's state obligations in its starting baseline for determining the environmental effect of the additional mining.

---

[5] Reclamation under one previously approved state reclamation plan would include the creation of emergent wetlands and reforestation plantings, which would be limited to those areas surrounding the pits. (Admin Rec. at AR01682 (EIS at 122).) The five existing pits would be similarly reclaimed, and the processing area would have the hard surface removed, a planting medium placed over it, and be revegetated with valley forest species. (*Id.*) While some of this work has begun, Storedahl acknowledges that it has not completed its reclamation work.

In preparing a biological opinion on a proposed action, the Services were required to "evaluate the effects of the action." 50 C.F.R. § 402.14. The term "effects of the action" is defined in the ESA's implementing regulations as:

> Effects of the action refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur. Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration.

50 C.F.R. § 402.02. The ESA Section 7 Consultation Handbook adds:

> The baseline includes State, tribal, local, and private actions already affecting the species or that will occur contemporaneously with the consultation in progress. Unrelated Federal actions affecting the same species or critical habitat that have completed formal or informal consultation are also part of the environmental baseline, as are Federal and other actions within the action area that may benefit listed species or critical habitat.

Final ESA Section 7 Consultation Handbook, March 1998 at 4-22. The question before the court is whether it was proper for the Services to consider the current state of the land without taking into account the fact that Storedahl created the degraded conditions and was obligated to reclaim them.

Storedahl first contends that the Washington DNR "ordered" it not to comply with its state reclamation requirements until the finalization of the HCP. (Storedahl's Mot. at

9 (*see also* Admin Rec. at AR13172).)  Storedahl supports this assertion with a citation to

a December 22, 2003 letter from Doug Sutherland, Commissioner of Public Lands for the

DNR, addressed to Steven W. Landino, of NMFS, detailing Storedahl's compliance

history at the Daybreak Mine.  (Admin. Rec. at AR13172 (12/22/03 Letter) at 1.)  The

letter explains that on March 27, 2001, the DNR ordered Storedahl to rectify deficiencies

in its reclamation plan demonstrating "how the existing sediment ponds will be

reclaimed."  (*Id.*)  The letter goes on to explain that in April 2001, the DNR stayed

further action on its March order until a final decision is made on Storedahl's proposed

HCP.  The purpose of the stay was to "incorporate any relevant elements of the [HCP], if

approved, into the revised reclamation plan."  (*Id.*)  Mr. Sutherland concludes by noting

that the HCP and concurrent Surface Mine Reclamation Permit "must clearly outline

contingency measures."  (*Id.* at 2.)  After reviewing the letter, the court cannot agree with

Storedahl's characterization of the letter as an "order" to stop reclamation work.  Instead,

the court interprets the letter as a proposal by DNR to include, and likely benefit from,

the research Storedahl would conduct in preparing its HCP in order to improve the work

required in the state reclamation plan.

       Storedahl next argues that for the state reclamation work to be considered part of

the environmental baseline it must be "certain to occur."  (Storedahl's Mot. at 11 (citing

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 926-30 (9th Cir.

2008).)  The court questions the propriety of Storedahl's argument that the state

reclamation work that it is required to perform under state law is uncertain to occur.  As

this court views the argument, the only uncertainty is whether Storedahl actually intends

1    to perform its state obligations – a matter fully within Storedahl's control. While the

2    court agrees with Storedahl that hypothetical benefits from future state-required revisions

3    to Storedahl's reclamation plan may not be considered part of the environmental baseline,

4    the court finds that Storedahl's overall obligation to reclaim the land is far from

5    speculative. *See* RCW § 78.44.111 ("The permit holder shall reclaim each segment of

6    the mine within two years of completion of surface mining on that segment . . . .") The

7    only exception to this reclamation requirement is if the DNR provides a written

8    "segmental reclamation agreement" to Storedahl. *Id.* No such reclamation agreement

9    has been identified by the parties. Instead, the record supports a conclusion that the DNR

10   directed Storedahl to suspend implementation of the reclamation plan pending the final

11   decision on the HCP so that the conservation measures from the HCP could be

12   incorporated into a revised reclamation plan.[6] (Admin. Rec. at AR13172.) While it is

13   apparent that the DNR was attempting to bolster its reclamation requirements with the

14   conservation measures outlined in Storedahl's HCP, there can be no question that state

15   reclamation was legally required of Storedahl.[7]

16        The Services take a similar position by arguing that Storedahl's state reclamation

17   obligations are too hypothetical to be included in the environmental baseline. The

18   _____

19        [6] The record also reflects that any revised reclamation plan provided by Storedahl could
     not be granted until its past due annual fees were paid. (Admin. Rec. at AR13172 (12/22/03
20   DNR letter to Storedahl explaining that overdue notices have been sent once per month to
     Storedahl for the past 697 days).)

21        [7] The DNR wrote Storedahl in November 2000, five years after Storedahl had closed its
     mining operations stating that "[t]here is no dispute that this site is in need of reclamation."
22   (Admin. Rec. at AR05701.)

Services rely on the Ninth Circuit's unpublished decision in *Swan View Coal. v. Barbouletos*, No. 08-35685, 2009 WL 3287715 (9th Cir. October 13, 2009). (Services' Notice of Supp'l Auth. (Dkt. # 63) at 2). The Honorable Donald W. Molloy, District Judge for the District of Montana, presided over the *Swan View* case at the district court level and his opinion illustrates the fine distinction between what lies in the hypothetical and what may be considered real for purposes of determining the environmental baseline. Judge Molloy's opinion in *Swan View* is therefore instructive in the case before this court and thus requires an explanation of its dual holdings.

In *Swan View*, Judge Molloy addressed the protection of the grizzly bear, a threatened species under the ESA, in light of the use of winter motorized vehicles in the Flathead National Forest. *Swan View Coal. v. Barbouletos*, CV06-73-M-DWM, 2008 WL 5682094 (D. Mont. June 13, 2008). The plaintiffs in *Swan View* brought an action against the United States Forest Service ("Forest Service") and the FWS seeking judicial review under the APA of two biological opinions issued by the Forest Service. One biological opinion addressed a revised schedule to Amendment 19 of the Flathead National Forest Plan ("Amendment 19") and the second biological opinion addressed Amendment 24 to the same plan relating to snowmobiling ("Amendment 24").

Amendment 19 essentially established new forest-wide standards requiring that there be no net increase in the total motorized activity in the National Forest lands. *Id.* at *3. The *Snow View* plaintiffs argued that the biological opinion for Amendment 19 failed to consider improvements and goals that the Forest Service was supposed to have achieved under the Forest Plan as part of its environmental baseline. *Id.* Judge Molloy

disagreed, holding that "there is no legal support for the plaintiffs' position," because the language of 50 C.F.R. § 402.02 requires that in setting the environmental baseline the Forest Service must take into account the future impacts of "approved federal actions and proposed federal projects that have already undergone formal consultation." *Id.* at *12. Judge Molloy determined that the Forest Plan is not an action or a project but rather a "programmatic document that does not obligate the Forest Service to undertake specific projects." *Id.* The court focused on the absence of "a single statute, case, or regulation directing the [FWS] to consider programmatic planning documents in setting the environmental baseline." *Id.* (citations omitted). "Goals," according to Judge Molloy, do not create binding obligations in all future biological opinions and thus are not considered as part of the environmental baseline. *Id.*

In contrast, Judge Molloy held that the biological opinion supporting Amendment 24 relied on a faulty environmental baseline because it failed to consider the Forest Service's refusal to enforce its own rules. *Id.* at *15. Amendment 24 addressed the amount of land the Forest Service would open up to allow spring snowmobiling. In analyzing the environmental baseline, the FWS used the existing snowmobiling use in the National Forest. The plaintiffs, however, took issue with this baseline because under the Forest Plan in effect prior to Amendment 24 there was to be no snowmobiling allowed after the denning season for grizzly bears. Yet, because the Forest Service failed to enforce the prohibition on spring snowmobiling, the *existing* conditions reflected that spring snowmobiling was occurring throughout the National Forest. *Id.* at *13. The FWS's use of "existing degraded habitat conditions brought on by the Forest Service's

1  refusal to enforce its own rules [wa]s contrary to law." *Id.* at *16. Judge Molloy

2  determined that the Forest Service's failure to include its obligation to enforce the no

3  snowmobiling policy as part of the environmental baseline violated the ESA. *Id.*

4      Both sides appealed Judge Molloy's decision. The government, however,

5  withdrew its appeal on Amendment 24 before briefing in the Ninth Circuit had

6  commenced. (Services Supp'l at 2.) The Ninth Circuit therefore only considered Judge

7  Molloy's decision as to Amendment 19 and affirmed the holding, finding that "FWS

8  properly used *actual* habitat conditions as allowed by *Nat'l Wildlife*." *Swan View*, 2009

9  WL 3287715, *1 (citing *Nat'l Wildlife*, 524 F.3d at 926-30). The Ninth Circuit did not

10  have occasion to comment on Judge Molloy's decision with respect to Amendment 24

11  and whether the environmental baseline should include degraded conditions created by

12  the agency's failure to enforce its own rules.

13      This court is satisfied that the same incongruity and inequity described in Judge

14  Molloy's analysis of Amendment 24 applies here. Storedahl, as the permit holder, was

15  originally granted permission to mine gravel on approximately 70 acres next to the East

16  Fork, so long as it conducted reclamation activities with two years of completing its

17  mining activity. Storedahl failed to complete the reclamation within the time-frame set

18  by state law. The East Fork thereafter avulsed into the gravel pits created in part from

19  gravel mining in the area and damaging habitat for protected species of fish. Storedahl

20  now seeks an ITP that would permit it to "take" additional protected species of fish with

21  the promise of conservation measures that include its original state reclamation

22  obligations. Storedahl's delay in completing its state reclamation activities does not

1  provide adequate support for the notion that it should be permitted to conduct additional

2  gravel-pit mining based on its promise to perform reclamation work it was already

3  obligated to perform.

4       The questions raised by the parties of whether the reclamation activities of other

5  permit holders may be considered as part of the environmental baseline or whether an

6  environmental baseline should act as a "ledger for tracking compliance with state legal

7  obligations," are valid questions but are not present in this case.  Here, the actor

8  requesting to expand its take of protected species is the same one that has yet to finalize

9  its reclamation of its own prior gravel mining.  Thus, the "degraded habitat conditions"

10 present in this case – conditions for which Storedahl would receive credit for reclaiming

11 – is the same degraded habitat created by Storedahl.

12      The court therefore finds that Storedahl's original reclamation requirements are

13 not "hypothetical" but rather legal requirements binding Storedahl to reclaim the property

14 subject to its original permit.  The reclamation work is only "hypothetical" if Storedahl

15 has no intent of performing its state reclamation obligations.  The court disagrees that

16 *National Wildlife* dictates a different result.  In *National Wildlife*, the Ninth Circuit held

17 that the NMFS violated ESA by its use of hypothetical "reference operations," in its

18 jeopardy analysis.  524 F.3d at 927-28.  The "reference operations" at issue were broad

19 congressional mandates and "goals" that NMFS improperly included in its baseline

20 analysis.  Here, the state reclamation requirements do not sound in broad mandates or

21 goals.  The regulations applicable to Storedahl's unfinished reclamation work provide

22

that it "shall reclaim" the gravel mine within two years of completing its operations. RCW § 78.44.111.

Storedahl created the degraded baseline conditions present at the Daybreak Mine by failing to reclaim gravel pits pursuant to state law. Nevertheless, Storedahl seeks to benefit from its culpability in the degradation of the conditions by using the work it should have done as an incentive for the Services to issue ITPs permitting it potentially to take more protected species as part of its expanded gravel mining operations. While the court is not in a position to determine what, if any, impact an adjusted environmental baseline will have on the Services' decision to issue Storedahl the requested ITPs, the court is satisfied that, at a minimum, the Services should consider the state of the land as it should have been if Storedahl had met its state reclamation obligations, in establishing the baseline for its analysis.

C.    **Motion to Supplement**

After the hearing on the cross-motions for summary judgment, Storedahl moved to supplement the record with, or for the court to take judicial notice of, documents that show: (1) Storedahl submitted annual reclamation reports to the DNR; (2) Storedahl performed substantial reclamation of the ponds pursuant to a valid SMA permit and DNR-approved reclamation plan; and (3) that by 1997, Storedahl was developing a comprehensive revised reclamation plan covering the entire property. (Storedahl's Mot. (Dkt. # 67) at 2.)

Even if Storedahl's motion met the standard for considering extra-record evidence, which the court is not convinced it does, the question before the court is not whether

1 | Storedahl conducted sufficient reclamation work to satisfy its state obligations.  The

2 | question is whether the Services should have considered Storedahl's state obligations in

3 | determining the environmental baseline for its analysis.  Neither Storedahl nor the

4 | Services disputes the fact that the Services did not consider Storedahl's preexisting

5 | obligations when determining the proper baseline.  The court therefore leaves the

6 | determination of the net effect of Storedahl's past and future reclamation obligations to

7 | the Services in charge of reevaluating whether to issue ITPs to Storedahl.  The court

8 | presumes that the information provided by Storedahl regarding its past reclamation work

9 | will be valuable to this determination.  This information is not, however, relevant to the

10 | court's finding that the Services should have considered Storedahl's state obligations

11 | regarding reclamation as part of it environmental baseline and the court therefore denies

12 | the motion to supplement as moot.

13 | **D.    Range of Alternatives**

14 | East Fork Friends also contends that the EIS fails to satisfy NEPA requirements

15 | because the Services offered no alternatives that would be more protective of the listed

16 | species than the proposed HCP.  (East Fork Friends' Reply at 7.)  The Services have a

17 | duty to "[s]tudy, develop, and describe appropriate alternatives to recommended courses

18 | of action," 42 U.S.C. § 4332(E); to "[u]se the NEPA process to identify and assess the

19 | reasonable alternatives to proposed actions that will avoid or minimize adverse effects of

20 | these actions upon the quality of the human environment," 40 C.F.R. § 1500.2(e); and to

21 | "[r]igorously explore and objectively evaluate all reasonable alternatives."  40 C.F.R. §

22 | 1502.14(a).  In carrying out this duty, the Services are evaluated using the "rule of

reason." *See Nw Envt'l Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1538 (9th Cir. 1997) ("We review an agency's range of alternatives under a 'rule of reason' standard that 'requires an agency to set forth only those alternatives necessary to permit a reasoned choice.'") (citation omitted). The rule of reason requires an agency to set forth only those alternatives necessary to permit a "reasonable choice." *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (quoting *Save Lake Washington v. Frank*, 641 F.2d 1330, 1334 (9th Cir. 1981)).

The Services initially considered six alternatives, three "no action" alternatives, and three "action" alternatives. Two of these six (one in the no action category and one in the action category) were eliminated from detailed analysis because they did not meet project objectives. The four remaining project alternatives (two "no action" and two "action" alternatives) were subjected to "detailed study" in accordance with NEPA. 40 C.F.R. § 1502.14(a). In the first "no action" alternative, Storedahl proposed that the site would be divided into fourteen 20-acre residential or agricultural tracts, and processing of imported gravel would continue. No conservation measures would be implemented and no ITP would be required, hence the "no action" designation. (Admin. Rec. at AR 1535-38.) The Services determined that residential and agricultural development would produce its own set of environmental impacts and would not afford long-term habitat stewardship. (*See, e.g.*, Admin. Rec. at AR01537-38.) Under the second "no action" alternative, Storedahl would mine about 178 acres, but would not seek ITPs, and would reclaim the existing pits in accordance with state law, under which no off-site habitat

improvement would be required. (Admin. Rec. at AR01538-45.) This alternative was rejected as it afforded no habitat improvement.

As for the two "action alternatives," the preferred alternative and most environmentally protective would involve mining on 101 acres and would require ITPs and a commitment by Storedahl to complete the work promised in the HCP. (Admin. Rec. at AR01545-65.) The second action alternative is similar to the first but provides fewer conservation measures and allows mining on slightly more acreage (105 acres). (Admin. Rec. at AR01565-73.) Thus, the Services reasonably concluded that a less expensive, less protective alternative to the preferred action was a reasonable way to "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14 (explaining the goal of alternatives analysis). The Services' decision as to how best to define the issues is reasonable. They reasonably decided to compare a highly protective "action" alternative and a modestly protective one with two "no action" alternatives that are economically plausible but have greater environmental effects. The court finds that the Services did not act arbitrarily and capriciously in deciding to accept Storedahl's first action alternative. The court notes, however, that based on its finding that the threshold determination of the environmental baseline was fundamentally flawed, it is uncertain whether the alternatives presented by Storedahl on remand will be the same as those discussed herein.

**E.     Cumulative Effects**

East Fork Friends questions the Services' cumulative effects analysis because (1) the Services looked only at the impact during the term of the HCP without considering

the consequences of the HCP after it has expired; and (2) the Services identified the risk of avulsion into the existing Daybreak Mine pits as the greatest "adverse cumulative impact" on the species in the area but failed to address the fact that Storedahl was obligated under state law to reclaim these pits. (East Forks Friends Reply at 9.) Cumulative effects are defined as "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02.

East Fork Friends does not offer any support for the proposition that the Services did not consider the consequences once the HCP had expired, nor does it provide legal authority stating that the failure to consider future events supports a finding that the Services acted arbitrarily and capriciously. As for the second argument, this is simply a restatement of the argument that the Services used the wrong environmental baseline, which is discussed above. Accordingly, the cumulative effects analysis is dependent on the Services' determination of the environmental baseline and therefore must be reconsidered in light of the court's order to remand.

### III. CONCLUSION

The court grants summary judgment in favor of East Fork Friends and against the Defendants on claim one and claim three of the complaint. The court sets aside the NMFS and FWS biological opinions for failing to comply with ESA in setting the environmental baseline and consequently failing to consider an important aspect of the problem. The Services' issuance of the two ITPs was not in accordance with the APA.

1    The court finds that East Fork Friends has abandoned the remainder of its claims and

2 therefore it does not express an opinion on these claims.

3       The court GRANTS East Fork Friends' motion for summary judgment (Dkt. #

4 51); DENIES the Federal Defendants' cross-motion for summary judgment (Dkt. # 57);

5 DENIES Storedahl's motion for summary judgment (Dkt. # 58); and DENIES as MOOT

6 Storedahl's motion to supplement the administrative record (Dkt. # 67). The court sets

7 aside the Services' biological opinions for failure to apply the proper environmental

8 baseline to their opinions and therefore not acting in accordance with law. The court

9 remands the matter to the Services for further consideration consistent with this order.

10       Dated this 11th day of February, 2010.

11

12

13 _____

14 JAMES L. ROBART
   United States District Judge

15

16

17

18

19

20

21

22

ORDER- 23